# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT CHATTANOOGA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 1:13-cr-89 |
| | ) | |
| JOE JENKINS | ) | Judge Mattice/Carter |
| | ) | |

## REPORT and RECOMMENDATION

### I. Introduction

Defendant Joe Jenkins is charged under 21 U.S.C. § 841(a)(1) and (b)(1)(A) for conspiracy to distribute cocaine base, otherwise known as crack, and cocaine. At least some of the evidence against him stems from various wiretaps on various phones conducted pursuant to wiretaps authorized by this Court which were requested by federal law enforcement agents from May of 2012 (Target Telephone 4 (TT4)[1] (page ID# 1884)) to May 2013 (TT9). Defendant moves to suppress all evidence obtained from non-consensual intercepted electronic communications ("wiretaps") in this case, on the grounds the evidence was obtained in violation of the Fourth Amendment to the Constitution and in violation of 18 U.S.C. § 2510, et seq., and Fed. R. Crim. Proc. 41(c).[2] Because the undersigned concludes the relevant wiretap applications adequately set forth probable cause to issue the wiretaps, adequately met the necessity requirement, were issued pursuant to valid orders and were conducted with adequate

---

[1] Each phone number of a specific, targeted telephone is henceforth denoted by "TT" followed by the designated number. Thus, Target Telephone 4 is denoted as TT4, Target Telephone 5 as TT5 and so forth.

[2] In the first paragraph of his brief, Defendant also states the wiretaps violated the Fifth and Sixth Amendments, but his brief does not elaborate any further.

1

minimization, it is RECOMMENDED that the motion to suppress (Doc. 402) be DENIED in its entirety.

## II. Facts

The undersigned held an evidentiary hearing on Defendant's Motion to Suppress on September 18 and 19, 2014. Agent James Hixson of the Chattanooga Police Department, who is assigned to the Federal Drug Enforcement Agency (DEA) Task Force, testified. Based on the evidence obtained from this hearing and on the record as a whole, the undersigned makes the following findings of fact and subsequent recommendations.

Joe Jenkins is one of thirteen defendants charged in a Second Superseding Indictment (Doc. 200). He is charged in Count 1 only with a crack and powder cocaine conspiracy, a violation of 21 U.S.C. §§ 846 and 841(b)(1)(A). During the course of its investigation into the alleged drug trafficking activities of Juanzell Jenkins and others, the Government sought and obtained information through pen registers on numerous telephone numbers. This and other evidence including use of confidential informers ("CI's") led to requests for wiretap warrants on phones the Government believed were used by Juanzell Jenkins. The wiretaps were placed on TT4 through TT9; the Government intends to introduce evidence from TT4, 5 and 8 and asserts Defendant was not intercepted on any of the other wiretaps (Doc. 596, Response to Motion to Suppress, p. 1). TT4 and TT5 were for phone numbers used by Juanzell Jenkins, Defendant's brother, while TT6 and TT8 were used by Robert North, and TT7 and TT9 were used by Kenyata Jasper.

All of the wiretap orders were signed by United States District Judge Harry S. Mattice, Jr. The Court signed the order authorizing the wiretap on TT4 on May 10, 2012. (Page ID# 1884). It signed an order authorizing the wiretap on TT5 on February 4, 2013. (TT5 Order, Doc. 525,

Page ID# 1905). Interception commenced February 5 and continued until March 5, 2013, a period of 29 days. (First and Second reports on TT5, Doc. 586-3 and 586-4, Page ID## 2901 and 2909.)

The Court signed an order authorizing the wiretaps on TT6 and TT7 on April 2, 2013. (TT6/7 Order, Doc. 586-7, Page ID# 2935). Interception commenced April 3. It terminated the wiretap on TT6 on April 6 and terminated the wiretap on TT7 on April 21, 2013. (TT7 Report, Doc. 586-8, Page ID# 2936).

The Court signed the order authorizing the wiretap on TT8 on April 15, 2013. (TT8 Order, Doc. 525, Page ID# 1979). Interception commenced April 16 and terminated May 15, 2013, a period of 30 days. (TT9 Affidavit, Doc. 560-2, Page ID# 2650).

The Court signed the order authorizing the wiretap on TT9 on May 31, 2013. (TT9 Order, Doc. 586-16, Page ID# 2997). Interception commenced June 3 and terminated July 1, 2013, a period of 29 days. (TT9 Report, Doc. 586-17, Page ID# 2998).

In the course of its pen register and wiretap surveillance, the Government also obtained information on numerous other telephone numbers, asserting that these other numbers were being used by individuals who were also participants in the crack cocaine, cocaine powder, and money laundering operation. The Government identified telephone numbers it believed were utilized by Joe Jenkins by use of pen registers and wiretap surveillance. These phones were used to make and receive calls on three of the wiretaps, TT4 (associated with Joe Jenkins' brother Juanzell), TT5 (also associated with brother Juanzell Jenkins), and TT8 (associated with Robert North).

Joe Jenkins was not an original target of the Government's investigation. He came to light as a frequent speaker in phone conversations with his brother, Juanzell Jenkins, who was

3

the target, and as a result of an allegation by CS-2 that Joe Jenkins was involved in drug dealing with his brother (TT4 Affidavit, Doc. 525, p. 25, Page ID# 1830).

Joe Jenkins was not a "named interceptee" in the TT4 wiretap application in which his brother, Juanzell Jenkins; Gerald Toney; Jimmy Bush; and David Weaver were named. (TT4 Application, Doc. 539, p. 2, Page ID# 2341). The affidavit for the TT4 wiretap attested to the investigation's use of confidential source information, physical surveillance, controlled drug purchases, toll analysis, and pen registers. (TT4 Affidavit, Doc. 525, p. 5, Page ID# 1810). It mentioned Joe Jenkins not as a "named interceptee" but as one of the "other subjects" discussed in the affidavit. (TT4 Affidavit, Doc. 525, p. 11, Page ID# 1816). The affidavit went on to assert that the evidence would establish probable cause to believe the "named interceptees" would use TT4 to commit the crimes under investigation and that interception would shed light on how the "named interceptees" and their "confederates" operated. (TT4 Affidavit, Doc. 525, pp. 12-13, Page ID## 1817-1818). The affidavit relied on information and work from four confidential informants, one of whom had previously given information against Levar Williams, a defendant in another federal case. Joe Jenkins was named in connection with the investigation when (1) he was observed coming to and then leaving his mother's house at the same time as his brother, Juanzell, was allegedly conducting a drug transaction outside his mother's house; (2) he was observed returning to his mother's house later, as did his brother, Juanzell; and (3) on one occasion when a confidential informant was unable to contact Juanzell Jenkins, the informant drove to his mother's house on Citico Avenue and asked Joe Jenkins to ask his brother, Juanzell, to telephone the informant. Juanzell did not call. (TT4 Affidavit, Doc. 525, pp. 35, 36, 40 and paragraphs 66, 71, 80, Page ID## 1840-1841, 1845). As Defendant points out, the Affidavit omitted the fact that Joe Jenkins' residence was across the street from his mother's residence.

4

The First Report to the Court on TT4 reflected 2608 calls and 1399 short message services "SMS" messages intercepted. One thousand, three hundred and ninety-nine (1399) calls were completed, 265 calls and 62 SMS messages were deemed "pertinent" and 15 calls were minimized. (1st TT4 Report, Doc. 586-1, Page ID# 2888). The Government's second report reflected 3763 calls and 434 SMS messages. One thousand, nine hundred and sixty (1960) were completed calls. Four hundred and sixty-seven (467) calls and 166 SMS messages were deemed "pertinent." Thirty-eight (38) calls were minimized. According to the Government, "several calls" were so short that minimization was unnecessary. (2d TT4 Report, Doc. 586-2, Page ID## 2897-2898).

Joe Jenkins was listed as a named interceptee on the TT5 application. (TT5 Application, Doc. 525, p. 2, Page ID# 1886). The affidavit supporting this application provides the following as to Joe Jenkins: (1) A telephone number associated with Joe Jenkins had been intercepted on TT4, a number associated with brother Juanzell. (2) Joe Jenkins had a criminal record that included cocaine charges and at least one cocaine conviction. (3) Defendant was on supervised release for the cocaine conviction. (4) Between May 14 and June 12, 2012, Defendant had 67 "pertinent calls" with brother Juanzell on TT4. (TT5 Affidavit, Doc. 525, p. 9, Page ID# 1914, (dated 2/4/13)). The affidavit referenced two alleged "pertinent" intercepted calls from TT4 involving Joe Jenkins and Juanzell Jenkins. (TT5 Affidavit, Doc. 525, pp. 19-21, Page ID## 1924-1926). Neither conversation makes a clear, explicit mention of narcotics; however, affiant Agent Hixson swore that, based on his "training and experience and knowledge," both calls did involve discussions of cocaine.

The Government's First Report to the Court reflected 1006 calls on TT5, of which 915 were completed. Three hundred and seventy-one (371) calls were deemed pertinent and 0 calls

were minimized. (1st TT5 Report, Doc. 586-3, Page ID# 2901). In its Second Report to the Court the Government noted 1911 calls, of which 1699 were completed. Six hundred and forty-six (646) were deemed pertinent, 38 were minimized, and 5 involved privilege. "Several calls" were so short that minimization was unnecessary. (2d TT5 Report, Doc. 586-4, Page ID# 2909).

Joe Jenkins was not identified as a "named interceptee" on the TT6/TT7 application. (TT6/7 Application, Doc. 586-6, Page ID# 2916). A "Jumoke Jenkins" was named. The Order authorizing the wiretap names Jumoke Johnson, not "Jumoke Jenkins." (TT6/7 Order, Doc. 586-7, Page ID# 2927). The Government does not intend to introduce any evidence from TT7.

Joe Jenkins was not listed as an "interceptee" on the TT8 warrant application which targeted Robert North, Juanzell Jenkins, Kenyatta Jasper, Torrey Gilmore, and "others as yet unknown." (TT8, Application, Doc. 525, Page ID# 1960). The Government's First Report to the Court on TT8 reflected 758 calls, of which 184 were deemed pertinent and 5 were minimized. (1st TT8 Report, Doc. 586-13, Page ID# 2970). The Second Report to the Court on TT8 noted 2013 calls and 296 SMS messages intercepted, of which 12 were minimized and 287 deemed pertinent. (2d TT8 Report, Doc. 586-14, Page ID# 2975).

Joe Jenkins was a "named interceptee" for the warrant application on TT9. (TT9 Application, Doc. 586-15, Page ID# 2978). The Government asserts that there were no interceptions of Defendant on TT9. In the application for TT9, the basis for the Government's belief that Joe Jenkins was involved in the operation was (1) he had a criminal record that included cocaine charges and at least one cocaine conviction, (2) he was on supervised release for the cocaine conviction, (3) between May 14 and June 12, 2012, he had 67 "pertinent calls" with his brother Juanzell Jenkins on TT4. (Affidavit for TT9, Doc. 560-2, p 12, Page ID# 2647 (dated 5/31/13)). The language supporting targeting Joe Jenkins for TT9 is largely identical to

the language used to support targeting him for TT5; however, the Government did note in its affidavit that its TT9 pen register reflected 8 calls to/from a number associated with Joe Jenkins. (Affidavit for TT9, Doc. 560-2, p 21, Page ID# 2656). However, after authorization of the TT9 wiretap, which was based in part on the Government's assertion that a phone number associated with Joe Jenkins made eight calls to this number, the Government intercepted no calls involving Joe Jenkins.

In its First Report to the Court on TT9, the Government noted 148 calls intercepted and 15 SMS messages intercepted. Ten (10) calls were deemed pertinent and 0 calls were minimized. (TT9 Report, Doc. 586-17, Page ID# 2998).

### III. Analysis

#### A. *Franks v. Delaware* Issue

Defendant seeks suppression of evidence derived from the federal court authorized wiretaps. I will address the issues presented. Before doing so, I will address Defendant's request for a hearing pursuant to *Franks v. Delaware,* 438 U.S. 154 (1978). The Government argues defendant is not entitled to such a hearing, and his motion does not provide a basis to suppress the evidence seized from the defendant.

The Supreme Court held in *Franks* that "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." *Id*. at 155-56; *see also United States v. Poulsen,* 655 F.2d 492, 504 (6th Cir. 2011) (same); *United States v. Zimmer*, 14 F.3d 286 (6th Cir. 1994) (defendant has the burden of proving deliberate falsehood or reckless disregard for the truth);

*United States v. Henson*, 848 F.2d 1374, 1381 (6th Cir. 1988) (defendant bears burden to prove by preponderance of evidence that the affidavit contained false statements made knowingly or intentionally). The Sixth Circuit has stated the analysis as follows:

> A defendant who challenges the veracity of statements made in an affidavit that formed the basis for a warrant has a heavy burden. His allegations must be more than conclusory. He must point to specific false statements that he claims were made intentionally or with reckless disregard for the truth. He must accompany his allegations with an offer of proof. Moreover, he also should provide supporting affidavits or explain their absence. If he meets these requirements, then the question becomes whether, absent the challenged statements, there remains sufficient content in the affidavit to support a finding of probable cause.

*United States v. Bennett*, 905 F.2d 931, 934 (6th Cir.1990) (citations omitted).

A *Franks* hearing requires that the defendant make a substantial preliminary showing that the affiant, rather than the informant, deliberately or recklessly included false information in the affidavit. *Franks*, at 171; *United States v. Rodriguez-Suazo*, 346 F.3d 637, 648 (6th Cir. 2003); *United States v. Ayen*, 997 F.2d 1150, 1152 (6th Cir.1993); *United States v. Giacalone*, 853 F.2d 470, 477 (6th Cir. 1988); *see also, Mays v. City of Dayton*, 134 F.3d 809, 816 (6th Cir. 1998) ("*Franks* recognizes that information an affiant reports may not ultimately be accurate, and is willing to tolerate such a result at that early stage of the process, so long as the affiant believed the accuracy of the statement at the time it was made."). The officer's affidavit is entitled to a presumption of validity. *Franks*, 438 U.S. at 171.

In this case, Defendant filed an affidavit from his investigator pointing to a misidentification of Robert North in a drug deal which occurred in 2009 and detailed in paragraphs 32-40 of the affidavit for the wiretap on TT4. (TT4, Affidavit at 22-24, R. 525, Page ID## 1827-1829). Actually paragraphs 37-40 are the paragraphs in which North was identified. (TT4, Affidavit at 23-24, R. 525, Page ID## 1828-1829). As the Government argues, the

8

Defendant does not allege how striking North's name from these paragraphs would negate probable cause in this affidavit.  As the Government argued in their response, and as Agent Hixson testified at a hearing, he did review surveillance photos of the 2009 wire-tap investigation, and he did believe the person in the photograph was North.  Agent Hixson has since received information that the person in the photograph whom he misidentified as Robert North was another defendant, Boone Patterson, who was convicted federally of charges related to the distribution of cocaine.  Agent Hixson, however, did not know this at the time of the affidavit.   It is true that the person in the photograph in question was identified in a previous wiretap investigation (from 2009) as another person, Boone Patterson, by another affiant.  Agent Hixson, however, did not simply rely on this previous identification, but, rather, he actually looked at the photographs himself to determine the man's identity.  I agree with the Government's argument that in doing so he was in no way careless or reckless.  Agent Hixson actually went out of his way to identify the person himself.  He now knows that the person in said photograph was misidentified in both affidavits (the 2009 affidavit and TT4).  Regardless of this misidentification, even if this Court were to excise North's name, I conclude there was ample probable cause to support the issuance of the order authorizing interception in this case. Additionally, there was no showing that Hixson intentionally or recklessly provided false information, only that the information was incorrect.

The Defendant makes several other allegations of errors which the Government argues are not supported by an affidavit and which are either factually incorrect and/or do not affect probable cause.  For example, the defendant references a transaction CS-4 made with Juanzell Jenkins in paragraph 19(d) of TT-4, and then points to paragraphs 83-84 of TT-4 as support for the fact that CS-4 didn't have Juanzell Jenkins's number.  (Court File #403 at 20, R. 595 at 21)

(referring to TT4 Affidavit at 17-18, R. 525, Page ID## 1822-1823 and TT4 Affidavit at 41-42, R. 525, Page ID## 1846-1847).  The Defendant believes this demonstrates an inconsistency. However, the Government points out that CS-4 was being monitored and recorded as he met with an individual named Broome who gave his telephone to CS-4.  Therefore, only CS-4's portion of the conversation was monitored and recorded.  CS-4 later explained to law enforcement he was speaking with Juanzell Jenkins.  I conclude that any discrepancy here is minor and is neither knowing nor reckless.

The affidavit in support of the motion for a *Franks* hearing did set out some inconsistencies, and, on that basis, and because there were issues of minimization raised that would require testimony, the Court did allow Defendant to present evidence, so essentially the Court allowed a *Franks* hearing.[3]  None of the testimony presented in that hearing caused me to conclude Agent Hixson knowingly or recklessly included untrue information in the affidavit. The misidentification of North was understandable in light of the photographs presented at the hearing indicating similarities in appearance of Robert North, Boone Patterson and the person who was ultimately identified as the actual person in the picture, Jonathan Winters.  Other issues such as the failure to include in the affidavit that Joe Jenkins resided across the street from his mother do not appear to me to support a finding that Agent Hixson acted with knowing or reckless disregard for the truth when he prepared the wire-tap application. Although Defendant argues other wiretaps may be relevant for some purposes, the question is whether the applications for wiretaps of TT4, TT5 and TT8 are supported by probable cause and provide a

---

[3] As the undersigned will discuss in this Report and Recommendation, even when the statements allegedly made with reckless disregard for the truth are removed from the wiretap affidavits, the affidavits still support probable cause to issue the wiretaps.  Therefore, Defendant was not entitled to a hearing under *Franks v. Delaware;* however, allowing Defendant to have an evidentiary hearing in no way prejudiced him.

sufficient showing of necessity because those are the only wiretaps which contain information which the Government intends to use in evidence. I conclude Agent Hixson did not act with a reckless or intentional disregard for the truth when he swore to the wiretap applications for TT4, TT5, and TT8.

Further, as will be discussed in the next section, the affidavits in support of the wiretaps provide probable cause to issue the wiretaps, even when the statements objected to by the Defendant are removed from them.

## B. Probable Cause

The United States Court of Appeals for the Sixth Circuit has stated that "[t]he basic standards for a wiretap are similar to those for a search warrant, but there also must be strict compliance with Title III of the Omnibus Crime Control and Safe Streets Act of 1968 [Title III], 18 U.S.C. §§ 2510-2520." *United States v. v. Alfano*, 838 F.2d 158, 161-62 (6th Cir. 1988) (brackets added). The *Alfano* court further discussed what standards were necessary to be in compliance:

> That Act was enacted for the purpose of regularizing and controlling the issuance of warrants for wiretaps. At the same time, we are instructed that there is no specific formula that must be met for a warrant, and that evidence must be judged on the totality of the circumstances and in a reasonable and common sense manner. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Under this standard, the question that must be decided in issuing a warrant is whether there is probable cause to believe that evidence of a crime will be uncovered.

*Alfano*, 838 F.2d at 161-62. Stated another way, for the issuance of a wiretap order, probable cause is present if the totality of the circumstances reveals that there is a fair probability that a wiretap will uncover evidence of a crime. *United States v. Fairchild*, 189 F.3d 769, 775 (8th Cir. 1999); *United States v. Giacalone*, 853 F.2d 470, 478 (6th Cir. 1988); *United States v. LaPuma*,

1989 WL 125242 (6th Cir. Oct. 23, 1989) (unpublished); *United States v. O'Leary*, 1987 WL 36581, at 3 (6th Cir. Jan. 7, 1987) (unpublished).

Defendant argues that there is no probable cause in TT4 pointing to "multiple misleading statements." Defendant points to the misidentification of Robert North and various other deficiencies (Doc. 594, pp. 20-24). He then argues the affidavit for TT5, if "excised of information obtained by improper reliance on the TT4 wiretap" does not contain sufficient information to establish probable cause. I disagree for the reasons discussed below.

TT4 Wiretap

Agent James Hixson, a Task Force Officer with the Drug Enforcement Agency (DEA), was participating in an investigation of cocaine and cocaine base (crack) distribution by a suspected Chattanooga drug distribution organization involving Juanzell Jenkins. Agent Hixson was the Affiant on TT4, TT5 and TT8. The May 10, 2012, Application and Affidavit in support seeks authorization to tap a cellular phone, TT4, subscribed to Artavis Jenkins and utilized by Juanzell Jenkins (Application, Page ID# 2340 and Affidavit, Page ID# 1808). Named interceptees were Juanzell Jenkins, Gerald Toney, Jimmy Bush and David Weaver and others yet unknown who have committed, are committing and will continue to commit offenses involving:

> (a) Conspiracy to distribute and to possess with intent to distribute controlled substances, in violation of Title 21, U.S.C. § 846;
>
> (b) Distribution of and possession with intent to distribute controlled substances, in violation of Title 21, U.S.C. § 841(a)(1);
>
> (c) Use of a communication facility to commit, facilitate, or in furtherance of controlled substances violations in violation of Title 21, U.S.C. § 843(b);
>
> (d) Money laundering and conspiracy to commit money laundering, in violation of Title 18, U.S.C. §§ 1956 and 1957;

(e)     Aiding and abetting the aforementioned crimes, in violation of Title 18, U.S.C. § 2.

10.     As set forth below, there is probable cause to believe that the above offenses have been and are being committed by Juanzell JENKINS; Gerald TONEY, Jimmy BUSH, and David WEAVER and others yet known, (hereinafter referred to as the "NAMED INTERCEPTEES"), using TT4, used by Juanzell JENKINS. TT4 is subscribed to by Artavis JENKINS, 13 Millers Way, Adairsville, Georgia, and utilized by Juanzell JENKINS of 4904 Sarasota Drive, Hixson, Tennessee. As set forth more fully below, the investigation to date has revealed certain facts regarding the NAMED INTERCEPTEES and their participation in various drug trafficking activities.

(Application for TT4 wiretap, Page ID## 2341, 2342 and Affidavit, Page ID## 1809, 1810).

In support of probable cause, the Affidavit details the robust prior criminal records of Jenkins, Tony, Bush and Weaver, all of whom have prior drug related charges and convictions. (Affidavit, Page ID## 1811, 1813, 1814, 1816).

A review of phone tolls and pen register analysis connected Toney (Affidavit, Page ID# 1812), Bush (Affidavit, Page ID# 1813) and Weaver (Affidavit, Page ID# 1815) with Jenkins. Pen register and toll analysis is detailed in pages 47 to 49 of the Affidavit (Page ID## 1852-1854).

Evidence to support probable cause against Jenkins included at least four controlled purchases of cocaine and cocaine base (crack) and surveillance by police (Affidavit Page ID# 1822).  Intercepted calls were made on a phone previously owned by Jenkins in an earlier wiretap on another phone number, TT1.  Although the language used did not explicitly indicate drug transactions, based on his training and experience and knowledge of the investigation, Agent Hixson concluded the calls by Jenkins were related to drug transactions (Affidavit, Page ID## 1834-1836, Page ID## 1843, 1843 and Page ID## 1849, 1850).

Toney was identified by a confidential source as a significant distributor of cocaine in Chattanooga.  According to this confidential source who had proven reliable in the past, Toney was concealing the proceeds of his cocaine distribution in a recently opened car detailing business.

Probable cause related to Bush also included proffers and interviews which identified Bush as a significant distributor of cocaine and cocaine base in Chattanooga (Affidavit, Page ID# 1813).  The proffers were from federal defendants who have dealt cocaine with Bush and had first-hand knowledge.

As to Weaver, cooperating defendants and confidential sources identified Weaver as a significant distributor of cocaine and cocaine base. Some of the cooperating defendants and confidential sources had given reliable information in other cases (Affidavit, Page ID# 1815). Based on the totality of the circumstances shown in the affidavit for TT4, I conclude there is ample probable cause in the affidavit and that there was a fair probability that a wiretap would uncover evidence of a crime.

TT5 Wiretap

The February 4, 2013, Application and Affidavit in support seeks authorization to tap a cellular phone, TT5, subscribed to Artavis Jenkins and utilized by Juanzell Jenkins (Application, Page ID# 1885 and Affidavit, Page ID# 1908).  Named interceptees were Juanzell Jenkins, Gerald Toney, Robert Stephon North, Clifford Simpson, Sh'Kayla Watkins, Joe Jenkins and others yet unknown.

Probable cause to support the wiretap is present in the Affidavit.  As to Juanzell Jenkins, the investigation included confidential source information, physical surveillance, controlled drug

14

purchases, toll analysis, court authorized pen registers and a court authorized intercept (TT4) which supported his involvement as a crack cocaine dealer.

The information as to Gerald Toney included the same information set out in TT4 as well as intercepted calls between May 14 and June 12, 2013, where Toney was intercepted in 47 pertinent calls on TT4 which confirmed he was a close associate and co-conspirator with Jenkins (Affidavit p. 8, Page ID# 1913).

As to Joe Jenkins, in addition to his past prior record of conviction for conspiracy to distribute marijuana and cocaine, conspiracy to commit money laundering and his then current status as a supervised releasee for that offense, he was intercepted on 67 pertinent calls on TT4 confirming his active role in distributing cocaine (Affidavit p. 9, Page ID# 1914). The calls of May 14, 2012 and May 23, 2012 do not use the word cocaine, but the Affiant states as to both calls that based on his training and experience and knowledge of the investigation, the calls relate to cocaine transactions (Page ID## 1924, 1925).

The information in the application about Robert North is based on a review of police reports, detailed call records, pen register information and subpoenaed telephone subscriber information (Page ID# 1915). Information from a confidential source who had previously proven reliable, indicated North was distributing large quantities of cocaine in Chattanooga. The affiant had been present in numerous proffers and interviews in which individuals had identified North as a significant distributor of cocaine and cocaine base. Those proffers dealt directly with North (Page ID# 1915).

The investigation into co-defendant Clifford Simpson included phone toll and pen register analysis and court authorized intercepts which indicate Simpson is a source of supply of cocaine and marijuana for Jenkins. In addition to his robust prior criminal record which included

conviction for conspiracy to distribute cocaine, Simpson was identified as a source of supply of cocaine and marijuana for Jenkins in the court authorized intercept of TT4 including 632 pertinent calls and text messages during the TT4 interception (Page ID## 1916, 1917).

The investigation of Watkins was based on phone toll and pen register analysis and intercepts from TT4 which indicate her to be a close associate of Jenkins. Between May 14, 2012 and June 12, 2012, she was intercepted on 14 pertinent calls and 38 pertinent texts. Those confirmed her active role in distributing narcotics for Juanzell Jenkins (Page ID# 1918).

I conclude there was ample probable cause in the affidavit for TT5 and that there was a fair probability that a wiretap would uncover evidence of a crime.

TT8 Wiretap

The April 15, 2013, Application and Affidavit in support seeks authorization to tap a cellular phone, TT8, subscribed to Ashley Orr and used by Robert Stephon North (Application, Page ID# 1984 and Affidavit, Page ID# 1959). Named interceptees were Robert Stephon North, Juanzell Jenkins, Kenyatta Jasper, Torey Gilmore and others not yet known (Page ID# 1985).

The investigation of North was based on court authorized intercepts, phone toll and pen analysis and information from confidential sources that North was a close associate and co-conspirator and source of supply of cocaine for Juanzell Jenkins. Information from a previously proven reliable confidential source indicated North was distributing large quantities of cocaine and cocaine base (crack). Proffers/interviews were given by individuals who had dealt cocaine and cocaine base directly with North. That information along with North's prior felony drug history and phone calls intercepted on TT5, established North as a source of cocaine supply for Juanzell Jenkins (Page ID## 1985-1987).

16

Investigation of Juanzell Jenkins included confidential source information, physical surveillance, controlled drug purchases, toll analysis, court authorized pen registers and a court authorized intercept which indicated Jenkins was a cocaine and cocaine base dealer in Chattanooga. He was identified in numerous calls intercepted on TT4 and TT5 (Page ID# 1988).

Investigation of Kenyatta Jasper included confidential source information, physical surveillance, controlled drug purchases, toll analysis, court authorized pen registers and a court authorized intercept which indicated Jasper was a cocaine and cocaine base dealer in Chattanooga. Jasper and Jenkins were involved in 33 pertinent calls during the interception of TT5. As a result of those intercepts, Jasper was identified as a source of supply for cocaine. (Page ID## 1988, 1989).

Investigation of Torrey Gilmore is based primarily on information from phone toll and pen analysis and information from other law enforcement officers indicating Gilmore's involvement as a cocaine and cocaine base dealer. The affidavit relates his robust criminal history and points to information from a confidential source, who had previously proven reliable, indicating Gilmore was distributing cocaine base (crack) in Chattanooga. A review of phone toll and pen register activity for TT7 from March 4, 2013 to April 11, 2013, indicated 106 calls from Torrey Gilmore (Page ID# 1999).

I conclude the affidavit contained ample probable cause for the issuance of TT8 and that there was a fair probability that a wiretap would uncover evidence of a crime.

C. Necessity

Next, Defendant argues the wiretap applications fail to establish necessity. In order to obtain a wiretap, the Government must overcome the statutory presumption against this intrusive investigative method by proving necessity. *See United States v. Blackmon*, 273 F.3d 1204, 1207

17

(9th Cir. 2001). According to 18 U.S.C. § 2518(1)(c), the government may establish necessity for

a wiretap by any of three alternative methods. In order to demonstrate the "necessity" of the

wiretap, the government must provide a "full and complete" statement that traditional

investigative procedures (1) have been tried and failed; (2) reasonably appear unlikely to succeed

if tried; or (3) are too dangerous to try. *United States v. Rice*, 478 F.3d 704, 710 (6th Cir. 2007);

*United States v. Gonzalez, Inc.*, 412 F.3d 1102, 1112 (9th Cir. 2005).

> This "necessity" requirement is designed to ensure that
>
> wiretaps are not to be used thoughtlessly or in a dragnet fashion. As our court has said, what is needed is to show that wiretaps are not being routinely employed as the initial step in criminal investigation. However, the government is not required to prove that every other conceivable method has been tried and failed or that all avenues of investigation have been exhausted.

*United States v. Alfano*, 838 F.2d 158,163 (6th Cir. 1988) (internal citations omitted).

The necessity requirement is "simply designed to assure that wiretapping is not

resorted to in situations where traditional investigative techniques would suffice to

expose the crime." *United States v. Robertson*, 504 F.2d 289, 293 (5th Cir.1974). The

Sixth Circuit has explained the requirements of the necessity provisions for the Title III

statute:

> These provisions do not require that the police officials exhaust every conceivable non-wiretap investigative technique. All that is required is that the investigators give serious consideration to the non-wiretap techniques prior to applying for wiretap authority and that the court be informed of the reasons for the investigators' belief that such non-wiretap techniques have been or will likely be inadequate.

*United States v. Lambert*, 771 F.2d 83 (6th Cir. 1985) (citations omitted).

"The requirement that there be disclosure as to the use, success, and potential

success of other investigative techniques, however, does not mean 'that any particular

investigative procedures [must] be exhausted before a wiretap may be authorized.'"

18

*United States v. Miller*, 116 F.3d 641, 663 (2d Cir. 1997) (citing *United States v. Young*,

822 F.2d 1234, 1237 (2$^d$Cir.1987).  A defendant who seeks suppression of evidence

obtained through a wiretap bears the burden of production and persuasion to show the

wiretap violated some statutory or constitutional right.  *United States v. Patel*, __Fed.

Appx.___, 2014 WL 5335422 *3 (6th Cir. Oct. 21, 2014) (citing *United States v. Chaar*,

137 F.3d 359, 363 (6th Cir. 1998)).  The evidence is considered in the light most

favorable to the government.  *Patel*, __Fed. Appx.__, 2014 WL 5335422 * 3 (citing

*United States v. Rodriguez*-Suazo, 346 F.3d 673, 643 (6th Cir. 2003)).

The Sixth Circuit has recognized the unique value of the wiretap in fully investigating

telephone-dependent criminal conspiracies:

> [T]he mere fact that some investigative techniques were successful in uncovering
> evidence of wrongdoing does not mandate that a court negate the need for wiretap
> surveillance. We have previously recognized that "wiretapping is particularly
> appropriate when the telephone is routinely relied on to conduct the criminal
> enterprise under investigation." *United States v. Landmesser*, 553 F.2d 17, 20 (6th
> Cir.1977) (quoting *United States v. Steinberg*, 525 F.2d 1126, 1130 (2d
> Cir.1975)).

*United States v. Stewart*, 306 F.3d 295, 305-06 (6th Cir. 2002).

In each of the relevant interceptions (TTs 4, 5, and 8), Agent Hixson described in detail

in the respective affidavits the other, less intrusive methods of investigation that he used or

considered in this case.  In each affidavit, Agent Hixson addressed the need for interception to

determine the scope of the drug conspiracy and to determine the identity of Juanzell Jenkins'

cocaine sources (TT4, Page ID## 1855, 1856; TT5, Page ID## 1937, 1938; TT8, Page ID##

2001, 2002).  Agent Hixson specifically discussed alternative methods of investigation and why

they will not achieve the goals of the investigation.

19

In each affidavit Agent Hixson discussed the use or consideration of physical surveillance, use of grand jury subpoenas, interviews of subjects or associates, search warrants, infiltration by undercover officers, use of cooperating individuals, purchase of drugs by undercover officers and cooperating witnesses, review of telephone records including pen registers and trap and trace results, pole cameras, and trash pulls. (TT4 Affidavit, pp. 50-64, R. 525, Page ID## 1855-1869; TT5 Affidavit, pp. 31-44, R. 525, Page ID## 1936-1949; TT8 Affidavit, pp. 22-39, R. 525, Page ID## 2001-2018). I agree with the Government that the description in each of these sections of the affidavits is not so general as to be meaningless as the Defendant suggests. Agent Hixson provides information regarding this investigation and why these techniques are not sufficient to accomplish the goals of the investigation.

For example, in TT4, while discussing the limitations of physical surveillance, Agent Hixson gives a specific example that Juanzell Jenkins "uses evasive driving maneuvers and takes long indirect routes to arrive at particular locations." (TT4, Affidavit at 55, R. 525, Page ID# 1860). Another example from TT5 in the discussion of the use of cooperating individuals details how Juanzell Jenkins "has established a residence with utilities in an alias name" and that (Juanzell) "Jenkins frequently changes phone numbers and at one point cut off communication with CS-1 and dropped TT1 when he suspected CS-1 was working with law enforcement." (TT5, Affidavit at 44, R. 525, Page ID# 1949). Likewise, in TT8, Agent Hixson details specific dates and locations of multiple surveillances of the various targets of the investigation. (TT8 Affidavit at 27-29, R. 525, Page ID## 2006-2008).

As the Government points out, Juanzell Jenkins, who had a previous federal drug felony, was very careful. The affidavits show he took conscious measures to avoid detection by law enforcement. While the defendant argues that the United States could have arrested Juanzell

Jenkins without the necessity of a wiretap, I conclude, as did the District Judge, that the goals of the investigation which are clearly stated in each affidavit could not be accomplished without the interceptions. (TT4 Affidavit at 50-52, R. 525, Page ID## 1855-1857; TT5 Affidavit at 31-35, R. 525, Page ID## 1936-1940; TT8 Affidavit at 22-25, R. 525, Page ID## 2001-2004). The scope of the conspiracy and Juanzell Jenkins' drug sources could not be identified without the interceptions. More than one source of supply from Atlanta was actually discovered through these interceptions, and the sources were subsequently federally indicted. The consideration of these investigative alternatives satisfied the requirements of 18 U.S.C. § 2518(1)(c).

In each affidavit in this case, Agent Hixson adequately explained the necessity of the interceptions. The Court would have been aware of the alternative forms of investigation used, which were set out in the affidavits, and properly concluded on the basis of the affidavits why other forms of investigation would not accomplish all of the goals of the investigation such as determining the identity of suppliers and the entire scope of the conspiracy. The Court therefore authorized the wiretap. I conclude the Court did not err in this decision.

D. Orders Authorizing Wiretaps

Defendant argues that the Court violated 18 U.S.C. § 2518(3) in TT4 and TT5 because the Orders did not "specify" why alternative investigative techniques were inadequate. (Doc. 594 at p. 18, Page ID# 3051). The Court specifically found, "[n]ormal investigative procedures have been tried without success or have failed to yield the evidence sought, or reasonably appear unlikely to succeed if tried or would be too dangerous if tried." (TT4/TT5 Orders at 3, R. 525, Page ID## 1878/1899). The Court discussed in the finding of probable cause the expected information to be obtained through the interceptions including the nature, extent and methods of

drug trafficking, the identity and roles of accomplices, aiders and abettors, co-conspirators and participants in the drug related activities (TT4, Page ID 1877; TT5, Page ID## 1898).

As noted above, the affidavit establishes the necessity of the interceptions. There is no requirement that the Court list each alternative investigative technique and then rehash the reasons they were not or would not be effective in accomplishing the goals of the investigation. The affidavit sets out the reasons. The Court considered the reasons and found them sufficient. The Court ordered the interception. As with a search warrant, the Court in signing the wiretap warrant does not list the specific reasons it finds probable cause. The Court simply states that probable cause exists.

### *Timing of Interception*

The Order authorizing interception on TT4 was signed on May 10, 2012. Interception began on May 12, 2012, and ceased on June 12, 2012, at 11:59 pm. The interception did not exceed the 30 day period authorized by this Court's Order. Testimony at the hearing confirmed that the interception did not exceed 30 days.

### E. Minimization

Title III requires that wiretaps "shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception," 18 U.S.C. § 2518(5), meaning that law enforcement agents must make reasonable efforts to stop recording conversations which are not relevant, *i.e.* "non-pertinent" to the criminal investigation. *United States v. Patel*, __Fed. Appx. __, 2014 WL 533422 at *7- *8 (6th Cir. Oct. 21, 2014). "The wiretap statute 'does not forbid the interception of all nonrelevant conversations, but rather instructs the agents to conduct the surveillance in such a manner as to 'minimize' the interception of such conversations.'" *Id.* (citing *Scott v. United States*, 436 U.S. 128, 140

(1978)).  In determining whether agents have acted reasonably in minimizing non-pertinent calls, the Court must consider three factors: (1) the nature and scope of the criminal investigation, (2) the government's reasonable expectations of the character of conversations, and (3) the extent of judicial supervision over the surveillance.  *Patel*, __Fed. Appx.__, 2014 WL 533422 at *8 (citing *United States v. Feldman*, 606 F.2d 673, 678 (6th Cir. 1979)).  Each case must be considered on the basis of its own facts and circumstances.  *Patel*, __Fed. Appx.__, 2014 WL 533422 at *8 (citing *Scott*, 436 U.S. at 140).  Further, it is not enough that the defendant identify particular calls which should have been minimized but were not. Rather, a defendant must "establish a pattern of interception of innocent conversations which developed over the period of the wiretap." *Patel*, __Fed. Appx.__, 2014 WL 5335422 at *8 (citing *United States v. Lawson*, 780 F.2d 535, 540 (6th Cir. 1985)).  The defendant bears the burden to show that agents "exhibited a high disregard for [the defendant's] privacy rights or that they did not do all they reasonably could to avoid unnecessary intrusions."  *Patel*, __Fed. Appx.__, 2014 WL 533422 at *8 (citing *Feldman*, 606 F.2d at 679.)

The only testimony on the issue at the hearing was from Agent Hixson. He testified that once the Orders were signed by the Court, agents had "a minimization meeting" to discuss the proper procedures regarding minimizing irrelevant conservations before each wiretap was put in place.  It was his testimony that minimization was strictly followed. It is true that many calls were not minimized, but some certainly were.  It appears from the testimony that most of the non-pertinent calls that were not minimized were of too short a duration for the agents to minimize them.  The calls were completed before it could be determined whether they were pertinent.  Some that were not minimized went straight to voicemail but are still counted as a complete call.  Others are text messages.  In addition, agents had probable cause to believe the

named interceptees were involved in a large drug trafficking conspiracy, making it reasonable for agents to believe that many of the calls were part of the conspiracy. Further, the participants to the conversations often spoke in code making it difficult for agents to determine immediately which calls were pertinent and which were not. As the Sixth Circuit stated in *Patel*,

> In a case presenting a "wide-ranging conspiracy with a large number of participants, even a seasoned listener would have been hard pressed to determine with any precision the relevancy of many of the calls before they were completed." [*Scott*, 436 U.S.] at 142. Further, a large number of calls were ambiguous, "making characterization virtually impossible until the completion of these calls."

*Patel*, __Fed. Appx.__, 2014 WL 533422 at *8 (citing *Scott*, 436 U.S. at 142) (brackets added).

Because the relevant interception orders were for Juanzell Jenkins and Robert North, not the Defendant, the United States only listened to the Defendant's calls between the Defendant and his brother and North. Law enforcement knew that the Defendant's brother and North were sources of cocaine supply for the Defendant and reasonably listened to these calls.

Finally, I note that the Government provided regular reports to the Court for its review of the wiretaps. Based on the all the evidence before me, I conclude the Defendant has not met his burden to show agents acted with a high disregard for Defendant's privacy rights or that there was a pattern of interception of innocent conversations.[4]

### F. Good Faith Exception

The Government argues that even if the affidavits at issue fail to support probable cause to issue TT4, TT5, and TT8, the good faith exception to the exclusionary rule as articulated by the Supreme Court in *United States v. Leon*, 468 U.S. 897 (1984) and *Herring v. United States*,

---

[4] I also note that Defendant vigorously denied that certain conversations, which Agent Hixson testified were conducted in code by Defendant and his brother to discuss drug trafficking, had anything to do with drug trafficking. That argument is best left for the jury. For purposes of this motion, as previously discussed, the Court must consider the evidence in the light most favorable to the Government, and I do not conclude Agent Hixson is misrepresenting the truth to the Court.

24

555 U.S. 135 (2009) should apply. Neither *Leon* nor *Herring*, however, dealt with a wiretap. Wiretaps must not only comport with the Fourth Amendment but also with Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. § § 2510 *et seq.* which lays out specific procedures and standards which must be met in order to issue a wiretap. In *United States v. Rice*, 478 F.3d 704, 711 (6th Cir. 2007), the Sixth Circuit held that "the government's good faith argument is without merit, because the good faith exception to the warrant requirement is not applicable to warrants obtained pursuant to Title III." The Government did not address *Rice* and has thus offered no reason why the holding in *Rice* does not apply to the instant case. I conclude the good faith exception does not apply to the wiretaps at issue in this case.

## IV. Conclusion

The Defendant has failed to meet his burden to prove the wiretap evidence should be suppressed in this case. *United States v. Giacalone*, 853 F.2d 470, 482 (6th Cir.1988) ("the law is clear in this circuit that 'the burden of production and persuasion rests on the person seeking to suppress evidence'") (quoting *United States v. Smith*, 783 F.2d 648, 650 (6th Cir.1986)). I conclude there was ample probable cause shown in each of the four affidavits with or without the allegedly incorrect statements, necessity was satisfied in each of them, the Orders were sufficient, no interception exceeded 30 days, and the Government sufficiently satisfied the minimization requirement. [5]

For the reasons stated herein, I RECOMMEND[6] that Defendant Joe Jenkins' motion to suppress (Doc. 402) be DENIED.

S /William B. Mitchell Carter
UNITED STATES MAGISTRATE JUDGE

---

[5] There were several miscitations in the Government's brief which made it difficult for the undersigned to follow the Government's argument.

[6] Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 59(b)(2) of the Federal Rules of Criminal Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 88 L.Ed.2d 435, 106 S. Ct. 466 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive or general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).